## Commonwealth v. Locust Point Quarries, Inc.

*Eugene E. Dice,* Assistant Attorney General, for Commonwealth.

*John M. Eakin,* for defendant.

WEIDNER, *J.,* December 15, 1975.—On March 5, 1975, defendant was found guilty by District Justice Ross A. McAlicher on four counts of violating section 8 of the Air Pollution Control Act.[1] This conviction was specifically based upon the emission into the outdoor atmosphere of a fugitive air contaminant dust allegedly constituting a violation of section 123.1 of the rules and regulations of the Pennsylvania Department of Environmental Resources (hereinafter referred to as "DER").[2] Defendant has appealed from this summary conviction. A de novo hearing was held before this court on July 15, 1975. Counsel submitted briefs and oral argument was subsequently held on October 16, 1975.

Defendant contends, inter alia, that, because of its status as a stone quarry, dust emitted into the atmosphere is properly regulated and controlled by standards set forth in section 123.13 of DER's rules and regulations[3] and not by those set forth in sec-

---

1. Act of January 8, 1960, P. L (1959) 2119, sec. 8, as amended, 35 PS §4008.

2. 25 Pa. Code §123.1:

"(a) No person shall cause, suffer, or permit the emission into the outdoor atmosphere of any fugitive air contaminant from any source other than the fillowing (nine specific source categories). . . ."

3. 25 Pa. Code §123.13:

"(b) No person shall cause, suffer, or permit the emission into the outdoor atmosphere of particulate matter from any process listed in Table 1, at any time, either in excess of the rate calculated by the following formula or in such a manner that the concentration of particular matter in the effluent gas exceeds 0.02 grains per dry standard cubic foot, whichever is greater. . . ."

Process #3 of Table 1 is "Crushers or grinders or screens."

tion 123.1. As such, defendant suggests there is no evidence to prove beyond a reasonable doubt a violation of the applicable DER standards.

DER argues that the conviction is based upon a correct interpretation and application of section 123.1 and is fully supported by testimony of two air pollution control agents as to their observation of dust emissions on four separate occasions.

While it would initially appear that quarry operations, including equipment and facilities normally utilized therein, fall within the purview of section 123.13, the interpretation of regulatory construction offered by DER does suggest that this section was generally designed to deal with particulate matter emissions emanating exclusively from flues. Such a conclusion is supported by the basic organization of those regulations dealing with air contaminants, by the standards for testing and enforcement,[4] and by the nature of those processes listed in section 123.13.

Notwithstanding that a "flue" is never specifically referred to following the general section heading "Particulate Matter Emissions" or in the closest definition of that term,[5] such facts do not necessarily support defendant's contention that section 123.13 is the *proper* and *exclusive* regulation under which it could have been prosecuted. Moreover, this conclusion is reached accepting certain of the alleged sources of dust, namely storage bins, bucket elevator, hammer mill and truck loading areas, as integral parts of the collective quarry

4. In addition to the specific formula in section 123.13, see also language of testing standards in sections 139.11 and 139.12 utilized in conjunction with section 123.13; 25 Pa. Code §139.11-139.12.

5. 25 Pa. Code §121.1(28).

process, DER's attempt to distinguish these sources from the primary operation of crushers, grinders and screens specified in section 123.13 is unsupported by the broad definition of "process" found in section 121.1(30) of its rules and regulations.[6]

Simply stated, a quarry operation would appear to be included among those manufacturing industrial processes outlined in section 123.13. Clearly, if the instant action had been brought pursuant to an alleged violation of this section, technical evidence consistent with that required therein would have been necessary. DER, distinguishing the numeric pollution standard of section 123.13, readily concedes this point.

The above interpretation, in any event, does not preclude DER from prosecuting under another regulation restricting a distinct form of air contamination, and this would be permissible even though the same sources of contamination and the same contaminant are involved. See Rushton Mining Company v. Commonwealth of Pennsylvania, 16 Pa. Commonwealth Ct. 135, 328 A.2d 185 (1974). Thus, in the instant case, it is DER's prerogative to utilize section 123.1 in an effort to specifically control an alleged fugitive air contaminant despite the fact certain sources of this contaminant as well as the dust itself might have been concurrently involved in an application of section 123.13 as it relates to nonfugitive air contaminants or particulate matter emissions.

The language and structure of DER's rules and regulations, although somewhat hampered by cumbersome, albeit scientific terminology, does es-

---

6. 25 Pa. Code §121.1(30).

tablish an administrative distinction between standards for contaminants as "Fugitive Emissions" and as "Particulate Matter Emissions." Interpretation of these regulations indicates a valid application of section 123.1 in the instant circumstances. Dust observed by DER agents at defendant's quarry represented at least fugitive emissions. The question remains, however, whether such dust and testimony of DER agents as to its existence on four separate occasions is sufficient to sustain a violation of section 123.1. We conclude that it is not.

Section 123.1 prohibits the emission of "any fugitive air contaminants from any source" other than from nine specific exceptions, none of which is applicable here. Relevant definitions of terms provided in the Air Pollution Control Act[7] not only clearly indicate that dust constitutes an air contaminant but also logically suggests that the intent of section 123.1 is ultimately the control of air pollution. Section 3(5) defines "air pollution" as follows:

"The presence in the outdoor atmosphere of any form of contaminant in such place, manner, or concentration inimical or which may be inimical to the public health, safety, or welfare or which is, or may be injurious to human, plant or animal life, or to property, or which unreasonably interferes with the comfortable enjoyment of life or property."

Notwithstanding DER's position that section 123.1 should be strictly construed as an absolute ban against any fugitive air contaminant not specifically excepted, this court takes particular note of language in Bortz Coal Company v. Air Pollution Commission, 2 Pa. Commonwealth Ct. 441, 279

---

7. Act of January 8, 1960, P. L. (1959) 2119, sec. 3, as amended, 35 PS §4003.

A.2d 388 (1971), that the "rules, regulations, and standards of the regulatory agency must be reasonable, understandable, available, and must not violate the constitutional rights of any citizens." Accordingly, in order to find application of section 123.1 reasonable in the present circumstances, in our judgment DER must prove that the fugitive dust emitted caused or contributed to a condition of air pollution as defined above. To hold otherwise could conceivably result in prosecutions for the emission of rather insignificant quantities of fugitive dust, not an uncommon occurrence in everyday life. While such might be deemed de minimis infractions and, as noted by DER in section 123.1(a)(9), might be considered additional exceptions to the suggested general ban, without clear amplification by DER we are unable to speculate as to what "other sources and classes of sources" these might be.

Consistent with Rushton Mining Company v. Commonwealth of Pennsylvania, supra, we recognize the subjective quality of the air pollution standard set forth above. As such, scientific evidence of an alleged violation is neither the most persuasive nor the exclusive means of proof. Id. Given appropriate circumstances, testimony as to visual observations may indeed provide sufficient evidence to prove violation of a DER regulation. As stated in North American Coal Corp. v. Commonwealth, 2 Pa. Commonwealth Ct. 469, 477, 279 A.2d 356 (1971):

"[V]isual tests do constitute admissible evidence as a test, but nevertheless, when recognized scientific tests are available and practical, courts must insist upon their use and presentation. If there are no scientific tests possible or available, these cir-

cumstances must be explained upon the record. In such a case extraordinary care should be taken to make certain that the visual tests are made accurately and fairly and constitute sufficient proof to sustain the opinions of the experts presented."

Rushton Mining Company v. Commonwealth of Pennsylvania, supra, reemphasized the validity of visual evidence and held such evidence sufficient, in itself, to support an air pollution violation. However, the nature and extent of the evidence in Rushton is clearly distinguishable from that offered by DER in the case at bar. Their testimony of neighboring property owners as to the detrimental effect of fugitive coal dust supplemented the testimony of DER agents. Here, DER's case rests solely upon the testimony, aided by photographs, of two agents that certain fugitive dust was observed emanating from various points in defendant's quarry operation. This testimony indicated little attempt was made to systematically measure the volume, frequency, opacity or density of these emissions. Moreover, no attempt was made to relate these emissions to defendant's property line and possible effects upon adjacent property owners and/or users. While we may accept the difficulty in scientifically measuring the pollution potential of fugitive emissions, we are unable to conclude that the dust observed was such as to constitute air pollution as defined by the Air Pollution Control Act. Absent sufficient visual and/or scientific evidence to establish this fact, a conviction for violation of section 123.1 cannot be sustained.

In coming to the above conclusion, this court must take judicial notice of the fact that a stone quarry, even operating at peak air pollution control efficiency, will nonetheless generate some fugitive

dust. Given this fact, we are somewhat unable to appreciate why DER did not proceed to discuss additional methods of dust suppression with defendant, if such were, in fact, necessary. The record indicates that DER and defendant had, on prior occasions, worked together quite productively.

## ORDER

And now, December 15, 1975, based upon the foregoing discussion, defendant's appeal is sustained and the charges dismissed, with costs to the county.